**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**CASE NO: 0:24-cv-61987-AHS**

MICHAEL BARKER,
RICHARD ANDREWS,
RYAN SHAPIRO,
LAMA ALSHAMI, and
BRUNO BRITO DE OLIVEIRA,

      Plaintiffs,

v.

CAPITAL ONE FINANCIAL
CORPORATION D/B/A CAPITAL ONE,

      Defendant.

_____/

### CAPITAL ONE, N.A.'S MOTION TO DISMISS COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION AND FAILURE TO STATE A CLAIM

      Defendant, CAPITAL ONE, N.A. ("Capital One"), moves to dismiss the Complaint filed by Plaintiffs, MICHAEL BARKER, RICHARD ANDREWS, RYAN SHAPIRO, LAMA ALSHAMI, and BRUNO BRITO DE OLIVEIRA, for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. This Court lacks subject matter jurisdiction because Plaintiffs cannot meet the $75,000 minimum threshold for diversity jurisdiction by aggregating their damages or speculating as to the amounts. Additionally, Plaintiffs have failed to state a claim for violation of Fla. Stat. § 559.72(17) of the Florida Consumer Collection Practices Act ("FCCPA") on the following grounds: (1) federal and Virginia law govern the Capital One accounts at issue, and Florida law does not apply; (2) the emails at issue are not communications "in the collection of consumer debt," nor does the FCCPA apply to emails, and thus the emails are not actionable under the FCCPA; and (3) Plaintiffs fail to allege a sufficiently concrete injury for Article III standing. Capital One states the following in support:

## PROCEDURAL AND FACTUAL BACKGROUND

1. Plaintiffs filed the instant action against Capital One for purported FCCPA violations, claiming that Capital One sent Plaintiffs emails attempting to collect a consumer debt between the hours of 9 p.m. and 8 a.m. in violation of the FCCPA.[1]

2. Plaintiffs allege that each email caused their cellular phone "to emit an audible sound" that intruded upon their seclusion, invaded their privacy, and caused them to "waste time" by expending "approximately one minute of time retrieving" their phones in response to the communications.[2] The Plaintiffs do not allege they actually opened the courtesy emails.

3. Plaintiffs attached copies of the subject courtesy emails from Capital One, all of which simply informed Plaintiffs that their monthly periodic statements required by federal Regulation Z, 12 C.F.R. § 1026.7, were ready and available in Capital One's online banking platform and that regular monthly minimum payments were due on a forthcoming date.[3]

4. The Capital One accounts at issue are Plaintiff Barker's account ending in -7492; Plaintiff Andrews' account ending in -5823; Plaintiff Shapiro's account ending in -4292; Plaintiff Alshami's account ending in -7220; and Plaintiff Oliveria's account ending in -7869 (collectively, the "Accounts").[4]

5. The Accounts are governed by federal and Virginia law, pursuant to the respective Customer Agreements between Capital One and Plaintiffs. The Customer Agreement for Plaintiff Barker is attached as "Exhibit 1." The Customer Agreement for Plaintiff Andrews is attached as "Exhibit 2." The Customer Agreement for Plaintiff Shapiro is attached as "Exhibit 3." The

---

[1] Compl. ¶¶ 10-94.
[2] Compl. ¶¶ 19-22, 36-39, 53-56, 70-73, 87-90.
[3] Compl., Ex. A – Ex. E [DE 1-3 – DE 1-7].
[4] Compl., ¶¶ 10, 27, 44, 61, 78.

Customer Agreement for Plaintiff Alshami is attached as "Exhibit 4." The Customer Agreement for Plaintiff Oliveira is attached as "Exhibit 5."

6.      Plaintiffs seek statutory, actual, and punitive damages without providing any specific figures or calculations as to any amount.[5] Plaintiffs also seek an injunction prohibiting further after-hours email communications, costs, and attorney's fees.[6]

## LEGAL ARGUMENT

### I.      THIS COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFFS CANNOT MEET THE $75,000 AMOUNT IN CONTROVERSY NEEDED FOR DIVERSITY JURISDICTION.

Foremost, Plaintiff's Complaint must be dismissed for lack of subject matter jurisdiction, which serves as an independent ground for dismissal under Federal Rule of Civil Procedure 12(b)(1).[7] United States district courts have diversity jurisdiction if the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs, pursuant to 28 U.S.C. § 1332(a). It is undisputed for purposes of this Motion that the parties have diverse citizenship.

As for the amount in controversy, a plaintiff can satisfy the requirement if he or she claims "a sufficient sum in good faith."[8] However, "a conclusory allegation that the amount in controversy is satisfied is insufficient to sustain jurisdiction once that allegation is challenged."[9]  "Further, the

---

[5] Compl. ¶ 104.

[6] Compl. ¶ 104.

[7] Fed. R. Civ. P. 12(b)(1) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion: (1) lack of subject-matter jurisdiction;    …").

[8] *Doe v. Predator Catchers, Inc.*, 2023 U.S. Dist. LEXIS 107445, at *6 (M.D. Fla. June 21, 2023) (quoting *Federated Mut. Ins. Co. v. McKinnon Motors*, 329 F.3d 805 (11th Cir. 2003)).

[9] *First Acceptance Ins. v. Hemphill*, 2009 WL 10671295, at *2 (M.D. Fla. July 28, 2009).

party invoking the court's jurisdiction bears the burden of proving, by a preponderance of the evidence, facts supporting the existence of federal jurisdiction."[10]

Generally, a court can dismiss for failure to satisfy the amount in controversy requirement "only if it is convinced 'to a legal certainty' that the claims of the plaintiff in question will not exceed $75,000."[11] But "[w]hile a federal court must of course give due credit to the good faith claims of the plaintiff, a court would be remiss in its obligations if it accepted every claim of damages at face value, no matter how trivial the underlying injury."[12] "The inquiry should be objective and not based on fanciful, 'pie-in-the-sky,' or simply wishful amounts, because otherwise the policy to limit diversity jurisdiction will be frustrated."[13]

Importantly, "we do not aggregate the value of multiple plaintiffs' claims to satisfy the amount in controversy requirement simply because they are joined in a single lawsuit."[14] "Generally, if no single plaintiff can satisfy the jurisdictional amount, then there is no diversity jurisdiction."[15] In *Snyder v. Harris,* 394 U.S. 332 (1969), the Supreme Court held that aggregation is permissible to meet the amount-in-controversy requirement only where "two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest."[16] "[T]here are situations in which multiple plaintiffs have a unified, indivisible interest in some common fund that is the object of litigation, permitting them to add together, or 'aggregate,' their

---

[10] *McCormick v. Aderholt,* 293 F.3d 1254, 1257 (11th Cir. 2002).

[11] *McIntosh v. Royal Caribbean Cruises, Ltd.*, 5 F.4th 1309, 1312 (11th Cir. 2021).

[12] *Morrison v. Allstate Indem. Co*., 228 F.3d 1255, 1272 (11th Cir. 2000) (citation omitted).

[13] *Samuel-Bassett v. KIA Motors Am., Inc.,* 357 F.3d 392, 403 (3d Cir. 2004).

[14] *Leonard v. Enter. Rent a Car,* 279 F.3d 967, 974 (11th Cir. 2002).

[15] *Kirkland v. Midland Mortg. Co.,* 243 F.3d 1277, 1280 (11th Cir. 2001).

[16] *Snyder,* 394 U.S. 332 at 335; *see Darden v. Ford Consumer Fin. Co.,* 200 F.3d 753, 756 (11th Cir. 2000) ("Furthermore, the claims for compensatory damages of the individual Plaintiffs here cannot be aggregated to establish the required amount in controversy. …At least one individual plaintiff in a class action must have a damage claim greater than $75,000 for a federal court to have diversity jurisdiction over the case.").

individual stakes to reach the amount in controversy threshold."[17]  However, "[s]uch a 'common and undivided interest' is uncommon and exists only when a defendant owes an obligation to the group of plaintiffs and not to the plaintiffs severally."[18]

Equally important here is that the jurisdictional amount of $75,000 cannot be based on speculation.[19]  The prohibitions on aggregation and speculation apply to punitive damages, attorney's fees, and the value of injunctive relief.[20]  The value of injunctive or declaratory relief is "the value of the object of the litigation that would flow to the plaintiffs if the injunction were granted."[21]  If the monetary value of the requested injunctive relief is "too speculative and immeasurable to satisfy the amount in controversy requirement," the Court need not even address whether the injunctive relief should be aggregated.[22]

Here, it is a legal certainty that Plaintiffs' claims will not exceed $75,000.  Plaintiffs have failed to present allegations showing their claims meet the $75,000 amount without impermissibly aggregating their individual damages and relying on speculation.[23]  Plaintiffs do not have a common and undivided interest in "some common fund" that is the object of litigation as their claims are based on their own respective credit card accounts, which are in turn governed by separate and distinct Customer Agreements. Thus, any duty owed by Capital One to Plaintiffs is

---

[17] *Morrison v. Allstate Indemnity Co.,* 228 F.3d 1255, 1265 (11th Cir.2000).

[18] *Lutz v. Protective Life Ins. Co.,* 328 F. Supp. 2d 1350, 1361 (S.D. Fla. 2004).

[19] *See Bradley v. Kelly Servs., Inc.,* 224 F. App'x 893, 895 (11th Cir. 2007) (affirming dismissal of complaint for lack of jurisdiction where plaintiff was merely "speculating that her damages would exceed $75,000").

[20] *Kirkland v. Midland Mortg. Co.,* 243 F.3d 1277, 1280–81 (11th Cir. 2001) (citing *Morrison v. Allstate Indem. Co.,* 228 F.3d 1255, 1267 (11th Cir. 2000)); *Leonard,* 279 F.3d at 973.

[21] *Leonard,* 279 F.3d at 973.

[22] *Leonard,* 279 F.3d at 973.

[23] *See Klempner v. Northwestern Mutual Life Ins. Co.*, 196 F.Supp.2d 1233, 1238 (S.D. Fla. Dec. 17, 2001 ("Multiple plaintiffs cannot in the vast majority of cases aggregate the value of their claims to meet the jurisdictional threshold.")

distinct, separate, and severable, and is not owed to the Plaintiffs as a collective group.[24] Furthermore, Plaintiffs have pled only a conclusory allegation that the amount in controversy exceeds $75,000.[25] Plaintiffs do not even generally allege that they suffered any actual damages. Plaintiffs merely allege the emails from Capital One invaded each of their privacy and caused each Plaintiff to waste about one minute of time.[26] Plaintiffs also seek statutory and punitive damages and an injunction.[27]  However, Plaintiffs have not pled any calculations of the amounts of damages each individual allegedly incurred or quantified their prayer for damages with any other specific facts.

The only figure ascertainable is the statutory damages. Yet statutory damages under the FCCPA are limited to "as the court may allow, but not exceeding $1,000" per individual per action (so here, even if aggregation were permissible –it is not– that would amount to no more than $5,000).[28]  Aside from claiming the maximum statutory damages of $1,000, Plaintiffs impermissibly rely solely on speculation as to the amount of actual or compensatory damages for less than one minute of wasted time or any alleged invasion of privacy. Plaintiffs similarly rely on prohibited speculation as to any amounts for punitive damages, attorney's fees, or the value of the

---

[24] *See Lutz v. Protective Life Ins. Co*., 328 F.Supp.2d 1350, 1361 (S.D. Fla. Jun. 14, 2004), *citing to Morrison v. Allstate Indem. Co*., 228 F.3d 1255, 1262 (11th Cir. 2000) (noting that although "'[t]here are situations in which multiple plaintiffs have a *unified, indivisible interest in some common fund* that is the object of litigation, permitting them to add together, or "aggregate," their individual stakes to reach the amount in controversy threshold,' such a "common and undivided interest" is uncommon and exists only when a defendant owes an obligation to the group of plaintiffs and not to the plaintiffs severally."); *see also Morrison*, 228 F.3d at 1264 ("[W]hen multiple plaintiffs assert rights arising from individual insurance policies, their claims are separate and distinct, and accordingly, may not be aggregated.").

[25] Compl. ¶ 1.

[26] Compl. ¶¶ 19–22, 36–39, 53–56, 70–73, 87–90.

[27] Compl. ¶ 104.

[28] § 559.77(2), Fla. Stat. (2024); *Spence v. Citicorp Credit Servs., Inc.,* 2017 WL 708742, at *4 (M.D. Fla. Feb. 3, 2017) ("The foregoing provision [Fla. Stat. § 559.77(2)] has been interpreted by numerous courts to limit a plaintiff's claim for statutory damages to $1,000.00 per action, not per violation."), *report and recommendation adopted*, 2017 WL 700552 (M.D. Fla. Feb. 22, 2017).

requested injunctive relief to stop after hours emails. Indeed, the requested injunctive relief would not appear to be of any monetary value and thus cannot be considered.[29] Because Plaintiffs have not alleged any amounts or basis to determine the claims meet the $75,000 jurisdictional threshold, Plaintiffs cannot establish subject matter jurisdiction. Such failure is fatal to Plaintiffs' claim and incurable, as this Court is obligated to ensure this case satisfies its constitutional grant of authority.[30] Accordingly, the Complaint must be dismissed.[31]

## II.   PLAINTIFFS CANNOT ASSERT A VALID FCCPA CLAIM WHERE: (1) FEDERAL AND VIRGINIA LAW GOVERN THE ACCOUNTS; (2) THE COURTESY EMAILS ARE NOT ACTIONABLE UNDER THE FCCPA; AND (3) PLAINTIFFS LACK STANDING BECAUSE THEY DO NOT HAVE A CONCRETE INJURY.

Plaintiffs' claims should be dismissed even if the Court had jurisdiction. Each of the following grounds serves as an independent basis for dismissal for failure to state a claim upon

---

[29] *Leonard*, 279 F.3d at 973 ("Thus, the injunctive relief, unlike the compensatory and punitive relief, will not be of any monetary value to the class members, and cannot be considered for amount in controversy purposes.").

[30] *Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1422 (11th Cir. 1995) ("Before rendering a decision ... every federal court operates under an independent obligation to ensure it is presented with the kind of concrete controversy upon which its constitutional grant of authority is based; and this obligation on the court to examine its own jurisdiction continues at each stage of the proceedings, even if no party raises the jurisdictional issue and both parties are prepared to concede it." (*quoting Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 759 (11th Cir. 1991))); *see also University of South Alabama v. American Tobacco Co*., 168 F.3d 405, 410 (11th Cir. 1999) ( "[I]t is well settled that a federal court is obligated to inquire into subject matter jurisdiction sua sponte whenever it may be lacking," and in turn, "[O]nce a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue.").

[31] *See Bradley v. Kelly Servs., Inc.*, 224 F. App'x 893, 895 (11th Cir. 2007) (affirming dismissal of complaint for lack of jurisdiction where plaintiff "made general allegations that she suffered damages" but "never quantified these losses with any specific dollar figures" and was merely "speculating that her damages would exceed $75,000"); *Est. of Levine v. QBE First Ins. Agency, Inc.,* 2017 WL 4326693, at *3 (S.D. Fla. Aug. 4, 2017) ("A plaintiff cannot establish subject matter jurisdiction by alleging actual damages of under $4,000, simply by arguing that it *could* obtain punitive damages in excess of $70,000 based on FCCPA and common law tortious interference claims.").

which relief may be granted under Federal Rule of Civil Procedure 12(b)(6).[32]  First, the Court should dismiss Plaintiffs' FCCPA claims because the controlling choice of law provision imposing federal and Virginia law governs Plaintiffs' and Capital One's interaction with the Accounts, and Florida law has no application. Also, Plaintiffs lack standing to pursue an FCCPA claim because they do not have a concrete injury.[33] Moreover, the subject emails are not actionable under the FCCPA because they are not communications made "in the collection of consumer debt," as Capital One was not seeking to collect on the Accounts by sending these emails, and indeed, the FCCPA does not even apply to emails (but only telephone calls). Capital One was simply notifying Plaintiffs that their monthly periodic statements required by federal Regulation Z, 12 CFR § 1026.7, were ready and available in Capital One's online banking platform.[34]

A.  **Federal and Virginia Law Govern the Accounts, and Florida Law is Not Applicable.**

The Customer Agreements are dispositive here where at base, Plaintiffs complain about the time and content of Capital One's communications with them about their respective Accounts. The Customer Agreements specifically address Capital One's methods and manner of "Communications" with customers, and further specifies that "Statements" would be sent or made available to customers.[35] Thus, Capital One's communications are directly related to the Customer

---

[32] Fed. R. Civ. P. 12(b)(6) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion: … (6) failure to state a claim upon which relief can be granted.").

[33] *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) (holding that "a bare procedural violation, divorced from any concrete harm" does not confer standing).

[34] Notably, Plaintiffs each voluntarily consented to receive the subject account statement emails when they enrolled in paperless communications. This is a valuable service offered by Capital One to consumers who desire to get their statements and other documents online instead of in the mail. By affirmatively enrolling in and consenting to receive paperless communications, Plaintiffs each elected to receive their account statements through the online banking platform (whether accessed through a personal computer or mobile device), Capital One's website, or other electronic means.

[35] "Communications", Exs. A-E, pp. 4- 5; "Statements", Exs. A-E, p. 2.

Agreements by their very terms. In turn, communication-based causes of action, such as Plaintiffs' FCCPA claims, are directly related to the Customer Agreements.[36] There is thus a significant relationship between the Customer Agreements and Plaintiffs' claims.

Additionally, Florida law specifically allows choice of law contractual provisions, stating, "[e]xcept as provided in this section, when a transaction bears a reasonable relation to this state and also to another state or nation, the parties may agree that the law either of this state or of such other state or nation will govern their rights and duties."[37] Indeed, Florida Supreme Court precedent demonstrates that Capital One's choice of law provision governing the Agreement is customary.[38]

In fact, choice of law clauses consistently provide that the agreement be governed, construed, interpreted, or enforced by or in accordance with the laws of the State of Florida or another state of the parties' choosing.[39] And federal courts routinely find that choice of law provisions govern statutory torts.[40] So do State Courts. In fact, a Brevard County Court judge

---

[36] *See Warner v. Goldman Sachs Bank, USA*, 2024 Fla. Cir. LEXIS 1250 at *5 (Fla. Cty. Ct. Brevard Nov. 4, 2024) (finding that the Utah choice-of-law provision within the Card Agreement governing plaintiff's credit card applied to the subject email serving the basis for plaintiff's FCCPA claim, in that, "the Subject Email notified Plaintiff that his upcoming payment deadline on the Account was approaching. Thus, the Subject Email indisputably was an Account-related communication.").

[37] Fla. Stat. § 671.105.

[38] *Tribeca Asset Mgmt., Inc. v. Ancla Int'l, S.A.,* 336 So. 3d 246, 248 (Fla. 2022) (emphasis added) ("Where a contract is clear and unambiguous, it must be enforced pursuant to its plain language." ... Choice of law clauses reflect "[a]n agreement between parties to be bound by the substantive laws of another jurisdiction." ... "It is well established that when the parties to a contract have indicated their intention as to the law which is to govern, it will be governed by such law in accordance with the intent of the parties.")

[39] *See, e.g.*, *Banco Indus. de Venezuela C.A., Miami Agency v. de Saad*, 68 So. 3d 895, 898 (Fla. 2011) ("This contract shall be governed solely and exclusively by the laws of the State of Florida, specifically those of Dade County, Florida."); *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 308 n.2 (Fla. 2000) (the agreement "shall be governed and construed in accordance with the laws of the State of Delaware").

[40] *Arndt v. Twenty-One Eighty-five, LLC*, 448 F. Supp. 3d 1310, 1317 (S.D. Fla. 2020) ("Plaintiffs' [FCCPA] allegations directly relate to Defendants' obligations, duties, and performance under the

recently ruled that a Utah choice of law provision essentially preempted an FCCPA claim based on an alleged prohibited after-hours email: "Thus, Plaintiff's contention that the FCCPA is a 'statutory tort' that is not barred by a non-Florida choice-of-law provision is not persuasive."[41]

Here, the Customer Agreements are unambiguous—federal and Virginia law govern the Accounts, not Florida law. [42] The Customer Agreements explicitly state:

**The Law That Applies to Your Agreement**

**We make decisions to grant credit and issue you a *Card* from our offices in Virginia. This Agreement is governed by applicable federal law and by Virginia law. If any part of this Agreement is unenforceable, the remaining parts will remain in effect.[43]**

Under Florida's conflict of law rules, "[a]n agreement between parties to be bound by the substantive laws of another jurisdiction is presumptively valid."[44] Florida courts are to enforce a choice of law provision unless applying the chosen forum's law would contravene a strong public policy of this State.[45]  Moreover, that public policy must be of sufficient importance and rise above the level of routine policy considerations to warrant invalidation of a party's choice to be bound by the substantive law of another state.[46]  As a result, "there are only limited circumstances under

---

Finance Agreement. As such, the Finance Agreement's choice-of-law provision precludes Plaintiffs' state-law claim under the FCCPA."); *See also Martin v. Creative Mgmt. Grp., Inc.*, 2013 WL 12061809, at *9 (S.D. Fla. July 26, 2013) ("Where the parties agreed to a choice-of-law provision in their contract, claims brought under the statutes of other states are generally inapplicable." (citations omitted)).

[41] *See Warner*, 2024 Fla. Cir. LEXIS 1250 at *6-7.

[42] The Court may consider the choice-of-law provisions in the Customer Agreements governing the Accounts because the Agreements are central to Plaintiff's claims and their authenticity cannot be disputed. *See SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010).

[43] *See* Ex. 1, p. 5; Ex. 2, p. 5.; Ex. 3, p. 5; Ex. 4, p. 5; Ex. 6, p. 5.

[44] *Southeast Floating Docks, Inc. v. Auto-Owners Ins. Co.*, 82 So. 3d 73, 80 (Fla. 2012).

[45] *See Mazzoni Farms, Inc. v. E.I. DuPont De Nemours Co.,* 761 So.2d 306, 311 (Fla. 2000).

[46] *See id.* at 312.

which a choice-of-law provision will be invalidated for public policy reasons."[47] For example, the Supreme Court of Florida determined that the public policy in favor of giving effect to the contracting parties' express intentions outweighed the public policy inherent to an entire legislative scheme protecting consumers against usurious interest rates.[48] In all cases, "the party seeking to avoid the choice of law provision has the burden to show that application of the foreign law contravenes a strong public policy of Florida."[49] It is insufficient that the application of the foreign law may cause a different result than an application of Florida law.[50]

Here, when Plaintiffs opened their Accounts, they agreed through their respective Customer Agreements that the terms of their Accounts would be governed by federal and Virginia law. Enforcement of the binding choice of law provision that Plaintiffs agreed to does not contravene any strong Florida public policy. Rather, as the *Warner* court recently held, Florida has a strong public policy favoring freedom of contract, which courts give great deference to:

> The Court does not agree that Utah law contravenes a strong public policy in Florida such that it need not enforce the choice-of-law provision in the Agreement. ... Freedom of contract, on the other hand, is an important consideration in Florida jurisprudence, and a decision by this Court adopting Plaintiff's public policy arguments would instead contravene Florida's respect for the freedom of contract.[51]

---

[47] *Southeast Floating Docks,* 82 So. 3d at 80.

[48] *See Morgan Walton Props., Inc. v. Int'l City Bank & Trust Co*., 404 So.2d 1059, 1062 (Fla. 1981) ("The 'public policy' against usury ... was not so strong as to overcome the policy in favor of giving effect to the expressed intentions of contracting parties, even though as a factual matter the designation may indeed have been motivated by a desire to 'evade' Florida's usury law.") (discussing *Cont'l Mortg. Investors v. Sailboat Key, Inc*., 395 So.2d 507, 512–13 (Fla. 1981)).

[49] *Mazzoni Farms,* 761 So. 2d at 311; *see also Delhomme Indus., Inc. v. Houston Beechcraft, Inc.,* 669 F.2d 1049, 1058 (5th Cir. 1982) ("A choice of law provision in a contract is presumed valid until it is proved invalid. The party who seeks to prove such a provision invalid because it violates public policy bears the burden of proof.").

[50] *See Arndt*, 448 F. Supp. 3d at 1320 ("Stated differently, Plaintiffs assert the choice-of-law provision violates Florida public policy simply because a different result may be reached by applying Illinois law. The Court will not invalidate the choice-of-law provision on this ground.").

[51] *See Warner,* 2024 Fla. Cir. LEXIS 1250 at *5-6.

Thus, the standard is that Florida courts will enforce a choice-of-law provision unless applying the chosen forum's law would contravene a strong public policy of this State.[52] In short, Plaintiffs have not met their burden in showing that Virginia law would contravene a strong Florida public policy.[53] Plaintiffs cannot identify any Virginia law that would contravene a strong public policy of Florida. In truth, it was Plaintiffs who agreed to be bound by Virginia law in exchange for opening their respective Accounts with Capital One. And Virginia law – which would otherwise not apply to a Florida resident, and to which Florida owes full faith and credit – has its own consumer remedies Plaintiffs may avail themselves of should they have a good faith claim under those laws. Plaintiffs cannot now escape the terms of their respective Customer Agreements simply because they desire to avail themselves of Florida remedies. Moreover, there is a reasonable relation between Virginia law and the Accounts. Indeed, in this lawsuit Plaintiffs acknowledge Capital One has its principal place of business in McLean, Virginia.[54] Additionally, the Customer Agreements state Capital One "make[s] decisions to grant credit and issue [Plaintiffs] a *Card*"

---

[52] *See Mazzoni Farms, Inc. v. E.I. DuPont De Nemours Co.*, 761 So. 2d 306, 311 (Fla. 2000).

[53] *See Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.,* 761 So. 2d 306, 310–11 (Fla. 2000) ("Contrary to the nurseries' assertions, courts have uniformly enforced choice-of-law provisions without requiring the parties to brief the law of the chosen forum. …Moreover, it is incumbent upon the party seeking to avoid enforcement of the provision to show that the foreign law contravenes public policy of the forum jurisdiction. … In short, DuPont is neither required to brief the substantive law of Delaware nor obliged to demonstrate conflict between Delaware and Florida law; on the contrary, the choice-of-law provision is presumptively valid and it is the nurseries' burden to demonstrate why it should not be enforced. Therefore, the nurseries' contentions are without merit, and the first certified question is properly raised before this Court. Generally, Florida enforces choice-of-law provisions unless the law of the chosen forum contravenes strong public policy…. The nurseries contend that enforcing the choice-of-law provision would enable DuPont to contract against liability for fraud, thereby violating Florida public policy. DuPont, however, insists that the countervailing public policy must be fundamental, and that the countervailing policies in the instant case do not outweigh the policy of protecting the expectations of contracting parties.").

[54] *See* Compl., ¶ 8.

from its offices in Virginia.[55] The Customer Agreements also expressly covers Capital One's communications with Plaintiffs concerning the Accounts.[56]

Therefore, as the Accounts are governed by Customer Agreements with choice of law provisions imposing federal and Virginia law only, any claim arising out of the Customer Agreements (including a claim related to communications concerning the Accounts)[57] can only be rooted in federal or Virginia law. Accordingly, Plaintiffs' claims for purported FCCPA violations – claims arising exclusively under Florida law – should be dismissed.[58]

Other Florida statutory claims asserted under similar circumstances have been dismissed in favor of enforcing choice of law provisions removing Florida jurisdiction.[59] Indeed, a Capital

---

[55] *See* the section titled "The Law That Applies to Your Agreement" on Ex. 1, p. 5; Ex. 2, p. 5.; Ex. 3, p. 5; Ex. 4, p. 5; Ex. 6, p. 5.

[56] *See* the section titled "Communications" on Ex. 1, p. 5; Ex. 2, p. 4.; Ex. 3, p. 4; Ex. 4, p. 5; Ex. 6, p. 4.

[57] To the extent Plaintiffs relay on arbitration cases to argue that the Agreement must bear a "significant relationship" to the Agreement, those forum-selection clause cases have their own unique standard that does not apply to other contract clauses such as jury waivers and choice of law provisions. *See, e.g., Tribeca Asset Mgmt., Inc. v. Ancla Int'l, S.A*., 336 So. 3d 246, 248 (Fla. 2022) (explaining the difference between a choice-of-law provision and a forum-selection clause, reversing Third District's opinion conflating the two). *See also, Sandoval v. Wolfe,* 2017 WL 244111, *3 (S.D. Fla. Jan. 19, 2017) ("Plaintiff's RESPA, FDCPA, and FCCPA claims in this case are all based upon the disputed $250 fee for a motion to dismiss that would be necessary to resolve the mortgage foreclosure lawsuit and the allegedly excessive service of process charges incurred in the foreclosure lawsuit and reflected in the foreclosure judgment. All of these claims arise out of the mortgage . . . ."); *Levinson v. Green Tree Servicing, LLC*, 2015 WL 1912276, *2 (M.D. Fla. Apr. 27, 2015) ("Here, Plaintiff's consumer protection claims relate to the mortgage contract. Plaintiffs knowingly and voluntarily waived their right to a jury trial upon signing the mortgage, thereby creating a valid waiver of jury trial.") (applying *Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1340–41 (11th Cir.2012)); *Frank v. HSBC Mortg. Servs., Inc*., 2012 WL 246498, *1 (S.D. Fla. Jan. 23, 2012) (striking a jury demand when there are allegations of false credit reporting and a mortgage with an express jury trial waiver).

[58] *See Arndt*, 448 F. Supp. 3d at 1317-18 (dismissing FCCPA claim because plaintiff's account agreement included an Illinois choice of law provision and rejecting argument that the provision violated public policy); *Locicero v. Intrust Bank, N.A.*, 2018 WL 4374908, *8 (S.D. Fla. Sept. 13, 2018) (referencing application of Kansas choice of law provision to purported FCCPA claim made by Florida resident after dismissing FCCPA claim on other grounds).

[59] *See Southeast Floating Docks, Inc.*, 82 So. 3d at 81 (holding Florida's offer of judgment statute inapplicable where the parties agreed to be bound by the substantive laws of Michigan); *Sokolow*

One choice of law provision imposing Virginia law, like the one at issue here, has been recently applied to dismiss Texas statutory claims.[60]

Therefore, Plaintiffs have not and cannot state a claim against Capital One for purportedly violating a Florida statute concerning the timing of communications about their accounts, where the operative Customer Agreements governing their Accounts explicitly provide that federal and Virginia law exclusively apply.

The Court should dismiss the Complaint with prejudice, especially where any amendment would be futile.[61]

**B.   <u>The Subject Emails Are Not Actionable Under the FCCPA.</u>**

Plaintiffs' FCCPA claims should also be dismissed because the subject courtesy emails are not actionable under the FCCPA for two reasons; first, because the courtesy emails were not made in furtherance of collecting consumer debt; second, because §559.72(17), by its terms, only applies to telephone calls; and third, because Plaintiffs do not allege they actually opened and read the courtesy emails during the prohibited hours during which they were received.

---

*v. Damico*, 2019 WL 7188563, *6 (S.D. Fla. Dec. 26, 2019) ("Having concluded that Pennsylvania law provides the rule of decision, the Court must grant Defendants' motion for summary judgment as to the Florida statutory claims." (citations omitted)); *Pastor v. Union Cent. Life Ins. Co.*, 184 F. Supp. 2d 1301, 1308 (S.D. Fla. 2002), *aff'd*, 128 Fed. Appx. 100 (11th Cir. 2005) (dismissing complaint for violation of Florida statute because New Jersey law governed plaintiff's claims and thus, "Florida law is inapplicable to this dispute"); *Renslow v. Capital One Bank (USA), N.A.*, 2009 WL 10666842, at *6 (S.D. Fla. Jan. 8, 2009), *aff'd sub nom.*, 343 F. App'x. 457 (11th Cir. 2009) (plaintiffs' FDUTPA claims barred by parties' choice of Virginia law); *Hardee's Food Sys., Inc. v. Bennett*, 1994 WL 1372628, *5 (S.D. Fla. Mar. 24, 1994) (choice-of-law provision in parties' contract stating that North Carolina law governed defeated defendants' fraud claims brought under FDUTPA).
[60] *See Young v. Capital One Bank USA, N.A.*, 2024 WL 780415, *6-7 (E.D. Va. Feb 26, 2024) (Texas statutory claim could not be maintained where the contractual choice of law provisions required application of Virginia law).
[61] *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) ("A district court need not, however, allow an amendment … where amendment would be futile.").

Section 559.72(17) provides, "In collecting consumer debts, no person shall …
[c]ommunicate with the debtor between the hours of 9 p.m. and 8 a.m. in the debtor's time zone
without the prior consent of the debtor."[62] Thus, a communication must be made in furtherance of
"collecting consumer debt" to be actionable under the FCCPA.[63] However, federal courts have
held that not all communications between a debt collector and a debtor are covered by the debt
collection statutes, and communications which are informational in nature are outside the
application of the debt collection statutes.[64] In order "for a communication to be in connection
with the collection of a debt, an animating purpose of the communication must be to induce
payment by the debtor."[65] The trial court may determine whether a communication is sent in
connection with collection of an existing debt as a matter of law pursuant to the FCCPA.[66]

Even viewing the facts and the communications attached to the Complaint as Exhibits A
through E in the light most favorable to Plaintiffs, Plaintiffs cannot show that the emails were
made to collect a consumer debt. Plaintiffs primarily claim that the emails were made in connection
with collecting a debt simply because they contained the account balances, the minimum payment
amounts, and the ***forthcoming*** payment due dates.[67] However, the emails are purely informational
and intended to benefit the cardholder by notifying them that their monthly periodic account
statements required by the Truth in Lending Act and its implementing regulations are available

---

[62] § 559.72(17), Fla. Stat. (2024).

[63] "For a communication to be in connection with the collection of a debt, an animating purpose of the communication must be to induce payment by the debtor." *Hurtubise v. P.N.C. Bank, N.A.*, 2015 WL 3948192, at *4 (Fla. Cir. Ct. Jan. 5, 2015)(quotation and citation omitted).

[64] *See Parker v. Midland Credit Mgmt., Inc*., 874 F.Supp.2d 1353, 1356–57 (M.D. Fla. 2012); *Grden v. Leikin Ingber & Winters, PC*, 643 F.3d 169, 173 (6th Cir. 2011). "When viewed *in toto*, the purpose and intent of the FCCPA, like the FDCPA, is to eliminate abusive and harassing tactics in the collection of debts." *Trent v. Mortgage Elec. Registration Sys., Inc.*, 618 F. Supp. 2d 1356, 1361 (M.D. Fla. 2007), *aff'd,* 288 Fed. Appx. 571 (11th Cir. 2008).

[65] *Grden v. Leikin Ingber & Winters, PC*, 643 F.3d 169, 173 (6th Cir. 2011).

[66] *See Read v. MFP, Inc.,* 85 So.3d 1151, 1153 (Fla. 2d DCA 2012).

[67] *See* Compl., ¶¶ 17, 34, 51, 68, 85.

and payment can be made through Capital One's online banking platform. Although the emails state the payment due date and minimum payment (the alleged "debt"), such notice cannot be construed as an attempt to collect a debt because the debt (minimum payment) is not yet past due and, in any event, providing the due date is a requirement of Regulation Z.[68] Stating the statutorily-required date on the email notifying the customer of the availability of their statutorily-required statement cannot give rise to FCCPA liability.

For the same reason, Plaintiffs' additional reliance on boilerplate in their respective emails that "this is an attempt to collect a (consumer) debt (claim)," "[a]ny information obtained will be used for that purpose," "[t]his communication is from a debt collector," "make a payment now to avoid a late fee," and "[y]our payment is due tomorrow"[69] do not change the nature of the communications or establish a violation. Each email shows that the payments are not yet delinquent, and the disclosures themselves state they apply only "[i]f your account is past due" and if Plaintiffs lived in specified states other than Florida (i.e., Connecticut, District of Columbia, Hawaii, Massachusetts, New York City, North Carolina, or Oregon).[70] Even so, federal courts have found that such language identifying a communication as an "attempt to collect a debt" is not dispositive and does not automatically trigger consumer law protections.[71] Despite Plaintiffs' attempt to portray the communications otherwise, the emails do not contain any forceful,

---

[68] *See* 12 C.F.R. § 1026.7(b)(11).

[69] Compl. ¶¶ 15–16, 32–33, 49–50, 66–67 & Ex. A–D [DE 1-3, p. 3; DE 1-4, p. 3; DE 1-5, p. 3; DE 1-6, p. 3].

[70] Compl. Ex. A–D [DE 1-3, p. 3; DE 1-4, p. 3; DE 1-5, p. 3; DE 1-6, p. 3]. Additionally, the courtesy email relating to Plaintiff Oliveira's account ending in -7869 does not contain any language stating that the communication is from a "debt collector" or "an attempt to collect a debt." *See* Compl. Ex. E [DE 1-7].

[71] *Gburek v. Litton Loan Servicing LP,* 614 F.3d 380, 386 n.3 (7th Cir. 2010) ("The letter bore a disclaimer identifying it as an attempt to collect a debt, but this does not automatically trigger the protections of the FDCPA, just as the absence of such language does not have dispositive significance.") (citing to *Lewis v. ACB Bus. Servs., Inc.,* 135 F.3d 389, 400 (6th Cir. 1998)).

aggressive, or intimidating language to induce Plaintiffs to make a payment. The communications are purely informational and in some instances, provide a payment link as a convenience for customers who have voluntarily enrolled in paperless statements and, logically, also make online payments.[72] Accordingly, the emails are not actionable under the FCCPA, and Plaintiffs' FCCPA claims should be dismissed with prejudice.

Additionally, Plaintiffs' reliance on Section 559.72(17) is faulty because subsection (17) applies only to telephone calls and not emails based on the plain language of subparts (a) and (b), which state:

> In collecting consumer debts, no person shall: …
> (17) Communicate with the debtor between the hours of 9 p.m. and 8 a.m. in the debtor's time zone without the prior consent of the debtor.
> a) The person may presume that the time a **telephone call** is received conforms to the local time zone assigned to **the area code of the number called**, unless the person reasonably believes that the debtor's **telephone** is located in a different time zone.
> b) If, such as with **toll-free numbers**, an **area code** is not assigned to a specific geographic area, the person may presume that the time a **telephone call** is received conforms to the local time zone of the debtor's last known place of residence, unless the person reasonably believes that the debtor's **telephone** is located in a different time zone.[73]

As the above-emphasized terms show, subsections (a) and (b) reference only telephone calls. Under the principle of statutory construction, *expressio unius est exclusio alterius* (the negative implication canon), the mention of one thing implies the exclusion of the other.[74] As the sub-provisions of § 559.72(17) do not expressly include email communications (while also

---

[72] The courtesy emails relating to Plaintiff Barker's account ending in -7492 and Plaintiff Shapiro's account ending in -4292 do not contain any link to make a payment. *See* Compl., Exs. A, C [DE-3, DE-7].

[73] Fla. Stat. § 559.72(17) (emphasis added).

[74] *Gabriji, LLC v. Hollywood E., LLC*, 304 So. 3d 346, 351 (Fla. 4th DCA 2020) (quoting *Brown v. State*, 263 So. 3d 48, 51 (Fla. 4th DCA 2018)).

specifically referencing telephone calls), section 559.72(17) does not apply to emails under basic statutory interpretation.

This interpretation is also facially supported by the intent of the Florida Legislature when enacting the FCCPA, *i.e.,* to curb *egregious* debt collection practices.[75] Practically speaking, a telephone call can intrude upon a debtor's privacy between 9 p.m. to 8 a.m. and lure a debtor into a harassing conversation when they otherwise should be able to avoid unwanted phone calls. The same is not true for an email that the debtor generally must affirmatively sign up for, and then access and open to review, as with a letter on paper.[76] Moreover, the very statutory provision on which Plaintiffs rely does not apply to the emails central to Plaintiffs' claim. The plain language of the statute is very clear that "section 559.72(17) of the FCCPA does not apply to email communications."[77] Section 559.72(17) specifically prohibits "debt-collection communication in the form of telephone calls" between 9 p.m. and 8 a.m.[78] "The amendment of the statute in 2010 to include these very clear and repeated references to 'a telephone call,' 'debtor's telephone' and 'toll-free numbers' in its prohibitions against communicating with debtors during the prohibited time period makes sense given the proliferation of email after the FCCPA's original enactment (and subsequent amendments in 1997 and 2010)." [79]

---

[75] *Bank of Am., N.A. v. Siefker,* 201 So. 3d 811, 816 (Fla.4th DCA 2016) ("The FCCPA prohibits egregious debt collection practices and provides legal remedies to protect consumers from harassing collection efforts. The Brindises have not demonstrated that the mere filing of a foreclosure suit, even one seeking money damages, implicates those concerns.").

[76] *Collado v. 450 N. River Drive, LLC,* 2023 U.S. Dist. LEXIS 112066, *14 (S.D. Fla. June 29, 2023) ("Regarding the manner of noticing Putative Members of their rights to opt in, the parties agree that notice via email and United States mail are appropriate. The parties dispute whether notification via text message should also be permitted. Defendants argue that text messages are intrusive and may cause recipients to incur unwanted costs. … The Court agrees with Defendants that text messages are intrusive, may cause unwanted monetary charges to the recipients, and are not necessary in the circumstances of this case.").

[77] *Warner,* 2024 Fla. Cir. LEXIS 1250, *14.

[78] *Warner,* 2024 Fla. Cir. LEXIS 1250, *15.

[79] *Warner,* 2024 Fla. Cir. LEXIS 1250, *15-16.

As one Court found:

> The Court finds that the receipt of an email communication is no different than receipt of physical mail, which is silently delivered to a mailbox and the recipient elects when to retrieve it from the mailbox. As such, this Court finds that Section 559.72(17) does not apply to email communications. [80]

Finally, Plaintiffs further fail to state a claim because they do not allege the necessary element that they opened and read the courtesy emails during the prohibited hours in which they were received. Plaintiffs merely alleged each email caused their cellular phone "to emit an audible sound" that intruded upon their seclusion, invaded their privacy, and caused them to "waste time" by expending "approximately one minute of time retrieving" their phones in response to the communications.[81]

Plaintiffs' allegations are insufficient to state a claim under the FCCPA because like a tango, it takes two to communicate. In analyzing the FDCPA, i.e., the federal analog to the FCCPA, the Court in *Nina Quinn-Davis v. Trueaccord Corp.,* 2025 WL 4851344 (S.D. Fla. Nov. 20, 2024), recognized it takes *two* to communicate, and unopened emails fall short of communicating with a consumer:

> "If a tree falls in a forest and no one is around to hear it, does it make a sound?" … If I send an e-mail to you at 10:14 p.m., but you only open and read it the following day, did I "communicate with" you the night before when I sent it, or on the following day when you read it? Rather than engaging in a discourse on the interplay between perception and reality, this case turns on what "communicating with" another person means, …

> In short, the Court concludes that the phrase used by Congress means that you must actually transmit or transfer information *to another person* in order to "communicate with a consumer" and trigger potential liability under the FDCPA. Merely sending information into the ether of the internet by pushing "send" on your e-mail application does not suffice.

---

[80] *Warner,* 2024 Fla. Cir. LEXIS 1250, *13-14.
[81] Compl. ¶¶ 19-22, 36-39, 53-56, 70-73, 87-90.

> You don't need to be a Ph.D. in computer science to take judicial notice of the basic nature of e-mail communication. Hundreds of millions of Americans use e-mail all the time. Sending an email communication is only half the equation. …Simply put, if a debt collector "sends" an e-mail but the consumer never "receives" it, the debt collector has not "shared information" or "communicated with" anyone.[82]

The *Quinn-Davis* Court then noted that Florida courts have not construed the FCCPA in this email context, but it found that its same reasoning (above) applied to the FCCPA based on Florida's principles of statutory interpretation, the FCCPA's use of the same phrase "communicate with" used in the FDCPA, and the fact that Florida courts give "due consideration and great weight" to federal law.[83]

And here, as the above quote demonstrates, receiving the email to the Court in *Nina Quinn-Davis* means the email must be opened and read. To the extent the courtesy emails allegedly caused the Plaintiffs' cellular phone "to emit an audible sound" that irritated them,[84] the fault for that should be ascribed to these Plaintiffs, as such phone settings are entirely within a consumer's control:

> …Plaintiff's contention that he received an audible notification when he received the Subject Email only serves to confirm that his phone settings, which he selected, not GS Bank, were the cause of his annoyance and aggravation. Thus, Plaintiff himself (or whoever modified his mobile device settings to receive visual and audible notifications), and not GS Bank, is the source of this purported "annoyance and aggravation" that he suffered when he received the Subject Email.[85]

---

[82] *Id*. at *1, 5.
[83] Id. at *6-7.
[84] Compl. ¶¶ 19, 36, 53, 70, 87.
[85] *Warner,* 2024 Fla. Cir. LEXIS 1250, at *11.

LIEBLER, GONZALEZ & PORTUONDO
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, Florida 33130

**C. <u>Plaintiffs Have Not Alleged a Concrete Injury As Is Required for Standing.</u>**

Federal courts can only hear "Cases" or "Controversies."[86] From that limitation, the standing doctrine grew.[87] "The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court."[88] And in the process, standing ensures courts respect the separation-of-powers boundaries set out in the Constitution.[89]

To have standing, every plaintiff must show injury, causation, and redressability.[90] "But those three simple words are sometimes trickier to apply than it might seem, thrusting standing into the legal limelight these days."[91] The difficulty is sometimes most apparent when it comes to the first and foremost of standing's three elements —injury in fact.[92] Actionable injury in fact means plaintiff experienced "an invasion of a legally protected interest."[93] This injury must be (1) "concrete and particularized" and (2) "actual or imminent, not 'conjectural' or 'hypothetical.'"[94]

An injury is concrete if it is "*de facto*" (i.e., "it must actually exist" and be real," "not 'abstract'").[95] The "bare procedural violation" of a statute, however, is not enough, even if Congress prescribed a cause of action.[96] In other words, the Supreme Court "rejected the premise ... that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'"[97]

---

[86] U.S. Const. art. III, § 2.
[87] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016).
[88] *Id.*
[89] *Clapper v. Amnesty International USA*, 568 U.S. 398, 408 (2013).
[90] *Lujan v. Defenders of Wild Life*, 504 U.S. 555, 560-61 (1992).
[91] *Daisy, Inc. v. Mobile Mini, Inc.,* 489 F. Supp. 3d 1287, 1291 (M.D. Fla. 2020).
[92] *Daisy, Inc.,* 489 F. Supp. 3d at 1291.
[93] *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130.
[94] *Daisy, Inc.*, 489 F. Supp. 3d at 1291 (quoting *Lujan*, 504 U.S. at 560).
[95] *Daisy, Inc.*, 489 F. Supp. 3d at 1291 (quoting *Spokeo*, 136 S. Ct. at 1548 (citations omitted)).
[96] *Spokeo*, 136 S. Ct. at 1549.
[97] *Frank v. Gaos*, —— U.S. ——, 139 S. Ct. 1041, 1045, 203 L.Ed.2d 404 (2019) (quoting *Spokeo*, 136 S. Ct. at 1549).

In analyzing a sole junk fax received by email (which, as here, allegedly wasted one minute of time), Judge Sheri Polster Chappell found one minute of wasted time too insignificant to even be addressed by historical common law causes of action:

> … But the quality of harm—not the counting of seconds—decides concreteness.
>
> …
>
> In short, Daisy's alleged harm for one minute of wasted time resembles no historical cause of action. Rather, this is "the kind of fleeting infraction upon personal property that tort law has resisted addressing." *See Salcedo*, 936 F.3d at 1172. And it is "more akin to walking down a busy sidewalk and having a flyer briefly waived in one's face" than a harm conferring Article III standing.[98]

The other, second aspect of the *Spokeo* analysis is legislative judgment, which the *Daisy* Court also looked at in the context of one junk fax delivered by email. The *Daisy* Court noted that, "the [federal] statute prohibits unwanted ads sent from a fax machine, computer, or other device to a fax machine," and noted, [w]hile Congress could have extended that prohibition to faxes no matter how they are received, it did not," "[s]o there is no indication from the statutory text that Congress sought to protect against the harm of wasted time spent reviewing faxes received by e-mail."[99]

Of course, here the "legislature" at issue for the FCCPA is the Florida Legislature. And as discussed above, emails are nowhere mentioned in § 559.72(17) – only phone calls. This interpretation that subsection (17) applies only to telephone calls is also facially supported by the intent of the Florida Legislature when enacting the FCCPA, *i.e.,* to curb *egregious* debt collection practices.[100] Practically speaking, a telephone call can intrude upon a debtor's privacy between 9

---

[98] *Daisy, Inc.,* 489 F. Supp. 3d at 1292, 1295.

[99] *Id*. at 1295.

[100] *Bank of Am., N.A. v. Siefker,* 201 So. 3d 811, 816 (Fla.4th DCA 2016) ("The FCCPA prohibits **egregious** debt collection practices and provides legal remedies to protect consumers from harassing collection efforts. The Brindises have not demonstrated that the mere filing of a foreclosure suit, even one seeking money damages, implicates those concerns.") (emphasis added).

p.m. to 8 a.m. and lure a debtor into a harassing conversation when they otherwise should be able to avoid unwanted phone calls. The same is not true for an email that the debtor generally must affirmatively sign up for, and then access and open to review, as with a letter on paper.[101] As the *Daisy* Court noted, a fax that is delivered by email "did not deprive Daisy of using its fax machine or computer."[102] The emails which Plaintiffs have here filed a federal lawsuit over is "the kind of fleeting infraction upon personal property that tort law has resisted addressing," and it is "more akin to walking down a busy sidewalk and having a flyer briefly waived in one's face" than a harm conferring Article III standing.[103] As recently as May 2024, the Middle District reaffirmed the line of cases in this district holding that the mere receipt of a junk fax through email does not cause an injury in fact, and determined *Daisy* remains persuasive for its holding that "one wasted minute" spent reviewing an email is insufficient to establish a concrete injury.[104]

WHEREFORE, for the foregoing reasons and authorities, Defendant, CAPITAL ONE, N.A., requests that this Court grant this Motion to Dismiss the Complaint, award it its fees and

---

[101] *Collado v. 450 N. River Drive, LLC*, 2023 U.S. Dist. LEXIS 112066, *14 (S.D. Fla. June 29, 2023) ("Regarding the manner of noticing Putative Members of their rights to opt in, the parties agree that notice via email and United States mail are appropriate. The parties dispute whether notification via text message should also be permitted. Defendants argue that text messages are intrusive and may cause recipients to incur unwanted costs. … The Court agrees with Defendants that text messages are intrusive, may cause unwanted monetary charges to the recipients, and are not necessary in the circumstances of this case.").

[102] *Daisy, Inc.,* 489 F. Supp. 3d at 1294.

[103] *Daisy, Inc.,* 489 F. Supp. 3d at 1295.

[104] *Marc Irwin Sharfman M.D. P.A. v. Precision Imaging St. Augustine, LLC*, 2024 WL 3103671, *12 (M.D. Fla. May 23, 2024) (distinguishing *Drazen v. Pinto,* 74 F.4th 1336 (11th Cir. 2023), a TCPA case involving a text message, and stating that: "The undersigned agrees with the line of cases in this district holding that the mere receipt of a fax through an online fax service [i.e., by email] does not cause an injury in fact."), adopting R&R, 2024 WL 4460209, at *2 (M.D. Fla. Aug. 2, 2024) (Berger, J.). *See also*, *Heres v. Medicredit, Inc.,* 2024 WL 3291738, at *11 (S.D. Fla. July 3, 2024) (distinguishing *Drazen* when addressing an FDCPA claim based on a mailed letter).

costs pursuant to applicable statutes or contract, and grant all further relief the Court deems just and proper.

Respectfully submitted,

*/s/ Michael D. Starks*
ANDREW KEMP-GERSTEL
Florida Bar No. 0044332
Email: akg@lgplaw.com
Secondary Email: mkv@lgplaw.com
MICHAEL D. STARKS
Florida Bar No. 0086584
Email: mds2@lgplaw.com
Secondary Email: sck@lgplaw.com
**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor
44 West Flagler Street
Miami, Florida 33130
Telephone: (305) 379-0400
Facsimile: (305) 379-9626

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **20th** day of December, **2024**, I electronically caused the foregoing document to be filed with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record in the manner specified via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Michael D. Starks* _____
MICHAEL D. STARKS